Citation Nr: 1134092 
Decision Date: 09/12/11 Archive Date: 09/22/11

DOCKET NO. 00-08 179 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Los Angeles, California


THE ISSUES

Entitlement to compensation under 38 U.S.C. § 1151 for additional disability claimed to be due to VA medical treatment. 


REPRESENTATION

Veteran represented by: California Department of Veterans Affairs


ATTORNEY FOR THE BOARD

V. Chiappetta, Associate Counsel


INTRODUCTION

The Veteran served on active duty in the United States Army from March 1943 to November 1945. He is the recipient of a Purple Heart.
This matter comes before the Board of Veterans' Appeals (Board) on appeal from a December 1999 decision of the Department of Veterans Affairs (VA) Regional Office in Los Angeles, California (RO) which denied the Veteran's claim of entitlement to VA compensation benefits under the provisions of 38 U.S.C. § 1151. The Veteran disagreed with this determination, and perfected an appeal as to that issue.

In August 2001, the Board requested an opinion from an independent medical expert in internal medicine who is not an employee of the VA. In November 2001, the Board received the opinion. In April 2002, the Board denied the Veteran's claim. The Veteran appealed to the United States Court of Appeals for Veterans Claims (Court). In a July 2006 Order, the Court set aside the Board's decision and remanded the matter for further development. The Secretary of VA appealed the Court's Order to the United States Court of Appeals for the Federal Circuit (Federal Circuit). In December 2007, the Federal Circuit granted the Secretary's motion to vacate the Court's order and remand for further proceedings. In an October 2008 memorandum decision, the Court again set aside the Board's decision and remanded the matter for further development. The Court specifically instructed the Board to provide the Veteran with notification pursuant to the Veterans Claims Assistance Act of 2000 (VCAA).

In July 2009, the Board remanded the Veteran's claim. The Board specifically instructed the RO to contact the Veteran to inquire as to the disabilities for which he is seeking benefits under 38 U.S.C. § 1151, ask the Veteran to submit or identify post-January 2007 medical evidence regarding all such claimed disabilities, undertake any additional development it deems necessary to obtain current medical evidence regarding any such claimed disabilities, obtain all treatment records from the VA medical center in Long Beach, California, provide the Veteran an examination, and readjudicate the claim. Pursuant to the RO's November 2009 letter, the Veteran submitted a list of claimed disabilities in December 2009. The November 2009 letter also specifically requested that the Veteran submit or identify any post January 2007 medical evidence. Additionally, VA treatment records from Long Beach, California dated up to November 2009 have been associated with the claims folder, and the Veteran was provided a VA examination in April 2010. In July 2010, the RO readjudicated the claim based on the additional evidence received. Furthermore, a corrective VCAA notification was sent to the Veteran in July 2006. Thus, there is compliance with the Court and Board's remand instructions. See Stegall v. West, 11 Vet. App. 268, 271 (1998) [noting that where the remand orders of the Board are not complied with, the Board errs as a matter of law when it fails to ensure compliance].

On October 8, 2010, the Board issued a decision denying the Veteran's § 1151 compensation claim. The Veteran has since filed a motion to vacate the denial of this claim. As will be discussed below, the Board is granting this motion to vacate.

Please note this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2010). 38 U.S.C.A. § 7107(a)(2) (West 2002).


FINDINGS OF FACT

1. On October 8, 2010, the Board issued a decision addressing the issue of entitlement to compensation under 38 U.S.C. § 1151 for additional disability claimed to be due to VA medical treatment.

2. In August 2010, the VA received from the Veteran evidence that is pertinent to his claim. This evidence was not associated with the claims file at the time the Board issued its October 2010 decision.

3. The weight of the medical and other evidence of record is against the conclusion that the Veteran's claimed disabilities were caused by the negligent or careless administration of prescription medication.



CONCLUSIONS OF LAW

1. The Board's October 8, 2010 denial of the Veteran's compensation claim under 38 U.S.C. § 1151 is vacated. 38 U.S.C.A. § 7104(a) (West 2002); 38 C.F.R. § 20.904 (2010).

2. The criteria required for VA compensation benefits pursuant to 38 U.S.C.A. § 1151 for the claimed disabilities due to administration of prescription medication are not met. 38 U.S.C.A. §§ 1151, 5107 (West 2002).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Vacatur of the Board's October 8, 2010 decision

On October 8, 2010, the Board denied the Veteran's claim of entitlement to compensation under 38 U.S.C. § 1151 for additional disability, claimed to be due to VA medical treatment.

Pertinently however, the Appeals Management Center (AMC) received additional evidence from the Veteran significant to this claim approximately two months prior to the Board's denial, on August 11 and August 16, 2010. This evidence unfortunately was not associated with the claims folder at the time the Board issued its October 8, 2010 decision.

In this regard, controlling laws and regulations provide that the Board may vacate an appellate decision at any time upon request of the appellant or his or her representative, or on the Board's own motion, when an appellant has been denied due process of law or when benefits were allowed based on false or fraudulent evidence. 38 U.S.C.A. § 7104(a); 38 C.F.R. § 20.904.

With the above criteria in mind, the Board finds that not having the evidence in question when it decided the claim in the October 2010 decision denied the Veteran due process of law. Id. Accordingly, the Board must vacate its October 8, 2010 decision denying the Veteran's claim for compensation under the provisions of 38 U.S.C. § 1151. 

Readjudication of the vacated § 1151 claim on the merits

As noted above, the Veteran submitted additional medical evidence to VA in August 2010 that has not yet been considered by the Board or the agency of original jurisdiction (AOJ). Crucially, the Veteran submitted a written waiver of consideration of such evidence by the AOJ in a November 16, 2010 Statement in Support of Claim. See 38 C.F.R. § 20.1304 (2010). Thus, the Board is not barred from considering this new evidence in the first instance in readjudicating the claim on the merits herein. 

Duties to Notify and Assist

In correspondence dated in July 2006, the RO satisfied its duty to notify the Veteran under 38 U.S.C.A. § 5103(a) (West 2002) and 38 C.F.R. § 3.159(b) (2010). Specifically, the RO notified the Veteran of information and evidence necessary to substantiate the claim, information and evidence that VA would seek to provide, and information and evidence that the Veteran was expected to provide. The July 2006 letter also notified the Veteran of the process by which initial disability ratings and effective dates are established. Dingess v. Nicholson, 19 Vet. App. 473 (2006). The claim was subsequently readjudicated in a July 2010 supplemental statement of the case (SSOC). See Prickett v. Nicholson, 20 Vet. App. 370, 377-78 (2006) [noting that VA cured its failure to afford statutory notice to the claimant prior to an initial rating decision by issuing a notification letter after the decision, readjudicating the claim, and notifying the claimant of such readjudication in the statement of the case].

VA has done everything reasonably possible to assist the Veteran with respect to his claim for benefits in accordance with 38 U.S.C.A. § 5103A (West 2002) and 38 C.F.R. § 3.159(c) (2010). All identified and available treatment records have been secured. Additionally, as the Board will discuss in detail in its analysis below, the Veteran was provided with a VA examination in April 2010. The report of this examination reflects that the examiner reviewed the Veteran's past medical history, recorded his current complaints, conducted an appropriate physical examination, and rendered an appropriate opinion consistent with the remainder of the evidence of record. The Board, therefore, concludes that this examination report is adequate for purposes of rendering a decision in the instant appeal. See 38 C.F.R. § 4.2 (2010); see also Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The Veteran and his representative have not contended otherwise. Thus, the duties to notify and assist have been met.

Analysis

The Veteran, who is a physician, contends that he suffered permanent disability following VA prescription of channel blocker medication, in particular the drug Felodipine, which was prescribed to him by the VA for treatment of hypertension. Specifically, he has claimed that he suffered permanent residuals in the form of joint pain and stiffness, limited ambulation and instability, loss of dexterity, delayed or absent recall, recurrent ulcers, and internal bleeding as a result of the administration of this drug. He asserts that the drug either aggravated or caused his arthritis symptoms and aggravated his pre-existing gastrointestinal problems. Additionally, in December 2009, the Veteran listed the following conditions which have resulted from his use of Felodipine: multiple system failure, anemia, renal insufficiency, nocturia, bilateral varicose veins, claudicating, intracranial hemorrhage and residuals, cerebral ischemia, edema of the lower bilateral extremities, peripheral nerve disease, loss of balance, loss of dexterity, gall bladder and stones, diabetes mellitus, chronic fatigue, neuralgia of the right shoulder and right hip, cancer of the larynx, alopecia on his legs and arm pits, aortic aneurysm, muscular atrophy, bilateral cataracts, and degenerative cervical spine. The Veteran has submitted evidence, including medical treatises, a medical opinion from Dr. C.B., and his own medical opinion in support of his claim.

Where a veteran suffers an injury or aggravation of an injury as a result of VA medical treatment, and the injury or aggravation results in additional disability or death, then compensation, including disability, death, or dependency and indemnity compensation, shall be awarded in the same manner as if the additional disability or death were service-connected. 38 U.S.C.A. § 1151 (West 2002). As with any claim, when there is an approximate balance of positive and negative evidence regarding any matter material to the claim, the claimant shall be given the benefit of the doubt. 38 U.S.C.A. § 5107 (West 2002).

In order for the disability or death to qualify for compensation under 38 U.S.C.A. § 1151, the disability or death must not have been the result of the veteran's willful misconduct, and must have been caused by VA hospital care, medical or surgical treatment, or examination. Additionally, the VA hospital care, medical or surgical treatment, or examination that proximately caused the disability or death, must have been careless, negligent, lacked proper skill, or involved an error in judgment, or an event that was not reasonably foreseeable. 38 U.S.C.A. § 1151(a) (West 2002). The additional disability or death must not merely be coincidental with the VA hospitalization, medical, or surgical treatment. Finally, proof of aggravation, in the absence of evidence satisfying the causation requirement, will not suffice to make the additional disability or death compensable. 38 C.F.R. § 3.358(c)(1)(2) (2010).

In determining whether additional disability exists, the Board will compare a veteran's physical condition immediately prior to the disease or injury upon which the claim for compensation is based with his physical condition subsequent thereto. With regard to medical or surgical treatment, a veteran's physical condition prior to the disease or injury is the condition which the medical or surgical treatment was intended to alleviate. Compensation is not payable if the additional disability or death results from the continuance or natural progress of the disease or injury for which the training, treatment, or hospitalization was authorized. 38 C.F.R. § 3.358(b)(1), (2) (2010).

To determine whether there was informed consent, VA will consider whether the health care providers substantially complied with the requirements of § 17.32 of this chapter. Minor deviations from the requirements of § 17.32 of this chapter that are immaterial under the circumstances of a case will not defeat a finding of informed consent. 38 C.F.R. § 3.361(d) (2010).

Informed consent is the freely given consent that follows a careful explanation by the practitioner to the patient or the patient's surrogate of the proposed diagnostic or therapeutic procedure or course of treatment. The practitioner, who has primary responsibility for the patient or who will perform the particular procedure or provide the treatment, must explain in language understandable to the patient or surrogate the nature of a proposed procedure or treatment; the expected benefits; reasonably foreseeable associated risks, complications or side effects; reasonable and available alternatives; and anticipated results if nothing is done.

The informed consent process must be appropriately documented in the health record. 38 C.F.R. § 17.32(c), (d) (2010).

In this case, the Veteran sustained a bullet wound to his left leg during service in World War II. He has suffered from varicose veins in both legs since the 1940s. Service connection is in effect for residuals of a gunshot wound of the right leg and for bilateral varicose veins.

The Veteran had a long history of gastrointestinal problems, including chronic gastritis, ulcers and colonic polyps, as well as chronic renal insufficiency. In the early 1990s, he experienced transient ischemic attacks; a magnetic resonance imaging study of his brain in 1993 was interpreted as showing a possible infarct.

The Veteran's medical records show that his VA primary care physician initially prescribed Felodipine at a dosage of 5 mg a day for treatment of hypertension (in place of Nifedipine) in November 1994. The Veteran evidently stopped taking Felodipine after episodes of ankle edema and lightheadedness in July 1995, but resumed the medication shortly thereafter. His medical records during this time frame reflect multiple complaints of edema and generalized body aches, which were attributed to the medication. He stopped taking it altogether in June 1996. He began reporting arthritis-like joint pain in 1996 and early cataracts in 1998. A November 2001 treatment record noted that the Veteran had increased transient ischemic attack when taking Felodipine.

The Veteran has presented contentions to the effect that he believes his joint pain and stiffness, limited ambulation and instability, loss of dexterity, delayed or absent recall, recurrent ulcers, and internal bleeding were caused by Felodipine. He also asserts that Felodipine either aggravated or caused his arthritis symptoms and aggravated his pre-existing gastrointestinal problems. Most recently, as noted above, the Veteran has contended that he suffers from multiple system failure, anemia, renal insufficiency, nocturia, bilateral varicose veins, claudicating, intracranial hemorrhage and residuals, cerebral ischemia, edema of the lower bilateral extremities, peripheral nerve disease, loss of balance, loss of dexterity, gall bladder and stones, diabetes mellitus, chronic fatigue, neuralgia of the right shoulder and right hip, cancer of the larynx, alopecia on his legs and arm pits, aortic aneurysm, muscular atrophy, bilateral cataracts, and degenerative cervical spine due to his use of the medication. Additionally, in written argument received in December 2001, he presented another theory of entitlement, namely that his VA physicians negligently prescribed Felodipine despite the Veteran's concurrent ingestion of acetaminophen and grapefruit juice, and that such interaction caused his claimed disabilities.

The evidence includes a November 2001 Independent Medical Expert (IME) opinion. Contrary to the Veteran's recent assertion that the IME was actually a student, rather than an expert [see the Veteran's August 11, 2010 letter to VA], the Board notes that the opinion was in fact rendered by the Director of the Division of General Internal Medicine at a state university medical center. After summarizing the Veteran's medical history, the IME concluded as follows:

After review of his medical records and literature pertaining to the adverse events from felodipine use, I feel that it is unlikely that the patient's claimed disabilities are related to his Felodipine use. His recurrent ulcers and internal bleeding are most likely related to his H. pylori-like infection and its resistance to treatment. His limited ambulation and instability with loss of dexterity and delayed or absent recall is most likely due to his lacunar infarcts and long-standing hypertension. His joint pain and stiffening, which has resolved, was most likely due to a transient inflammatory polyarthritis. Any residual arthritic pain, particularly that relating to his shoulder, knee, and ankles, is most likely degenerative joint disease.

Subsequently, the Veteran was afforded a VA examination in April 2010, the report of which noted that the examiner reviewed the claims folder in conjunction with evaluation of the Veteran. The examiner noted the Veteran's extensive medical history in relation to his taking both Nifedipine and Felodipine between 1992 and 1996. The examiner indicated that the Veteran was treated with typical doses of medication. In addressing the Veteran's contention that the dosage was too high in light of his age and purported consumption of grapefruit juice that could lead to higher drug concentrations, the examiner noted that it was possible. The examiner noted that the dose the Veteran received was common and the main concern was the development of low blood pressure which would result in altering the dose or choosing an alternative treatment. The examiner further stated that there was no indication that low blood pressure was an issue. 

Additionally, the examiner indicated that the common adverse effects of the drugs were transient and generally resolved after they were discontinued. He stated that "[t]he probability that these adverse drug reactions were indicative of permanent injury is very unlikely given their transient, physiologic nature and long term adverse consequences related to their use has not been demonstrated." The examiner added that there were possible rare adverse drug reactions attributed to the drugs but that they could not be established with significant certainty as they occurred with a similar frequency to the placebo rate. He pointed out that the only commonly known adverse effect was lower extremity edema which significantly improved or resolved after discontinuation of the medication. He found that this side effect was not associated with any permanent residuals and any residual edema was likely due to the usual causes of the common problem (e.g. venous stasis). The examiner added that the only other symptom that temporarily occurred with the use of the medications was inflammatory polyarthritis which resolved a short time after discontinuation of Felodipine. It was noted that arthritis is listed as a potential adverse effect of Felodipine but occurred in less than one percent of users and was not inflammatory. The examiner noted that in this case, the Veteran's condition was diagnosed with an undetermined etiology and resolved as subsequent records show that the Veteran did not have inflammatory arthritis. It was noted that the Veteran's current condition is degenerative in nature which is consistent with the Veteran's age, as are the rest of the Veteran's problems which "are relatively common disease likely to occur in a patient of his age and with risk factors such as hypertension."

As to the Veteran's contention that if the use of drugs did not directly lead to his conditions, that it was possible by causing an adverse effect that led to use of to the other drugs for arthritis (e.g. Tylenol), these drugs could have caused his conditions. The examiner found no evidence in the record to show that the Veteran's chronic problems were related to any of his treatments. The examiner concluded that 

there is no evidence that either felodipine or nifedipine caused any adverse effects except lower extremity edema that resolved after discontinuation of the drug[s]. In addition, there is no evidence of direct or indirect effects of treatment with these drugs that caused any of his claimed problems nor other problems reviewed in the record. It is therefore less likely than not that treatment with felodipine or nifedipine was etiological to any of the identified problems or produced any additional disability. There is no evidence for careless, negligence, lack of proper skill, error in judgment, or similar instance or fault on the part of VA in prescribing felodipine or nifedipine.

The record also includes a contrary private medical opinion from Dr. C.B., who pertinently opined after reviewing the Veteran's medical records in February 2006 that "this patient's hypotension episodes in 1993, due to Felodipine, likely caused him to suffer significant brain ischemia resulting in additional neurologic loss which has contributed significantly to his current CNS [central nervous system] abnormalities." See Dr. C.B.'s February 13, 2006 medical opinion, page 1. Dr. C.B. explained that the use of Felodipine caused the Veteran to develop hypotension in 1993, and that the drop in the Veteran's systolic pressure due to the medication likely prevented the brain from receiving adequate profusion pressures resulting in cerebral ischemic changes. Dr. C.B. concluded that 

[i]t is not clear, because detailed neurologic exams were not contained in the record, that this patient's post hypotension neurologic signs and symptoms in 1993 cleared prior to his second major CNS event in 1999[;] therefore[,] without additional[] evidence it is likely that his current neurologic abnormalities are due in significant part [] to his 1993 hypotension events because his carotid vascular studies were essentially normal.

Finally, the Board notes that the Veteran himself is a medical doctor, who is competent to render an opinion upon matters requiring medical expertise such as the etiology of a particular disability. In this capacity, in support of his claim, the Veteran has presented the opinion that his VA physicians prescribed Felodipine in a negligent manner resulting in subsequent disability. He has indicated, in essence, that VA health care providers ignored contraindications, such as his age (over 65) and the fact that he drank grapefruit juice. The Veteran's representative asserts that because the Veteran is a physician, his own opinion as to the source of his claimed disabilities places the evidence as to this issue in equipoise and that the claim accordingly must be granted.

In adjudicating a claim, the Board is charged with the duty to assess the credibility and weight given to evidence. See Madden v. Gober, 125 F.3d 1477, 1481 (Fed. Cir. 1997), cert. denied, 523 U.S. 1046 (1998). Indeed, in Jefferson v. Principi, 271 F.3d 1072, 1076 (Fed. Cir. 2001), the United States Court of Appeals for the Federal Circuit, citing its decision in Madden, recognized that that Board had inherent fact-finding ability.

The Court has stated, in pertinent part, that "[t]he probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, the physician's knowledge and skill in analyzing the data, and the medical conclusion that the physician reaches. . . . As is true with any piece of evidence, the credibility and weight to be attached to these opinions [are] within the province of the adjudicator . . . ." Guerrieri v. Brown, 4 Vet. App. 467, 470-71 (1993). The Board may appropriately favor the opinion of one competent medical authority over another. See Owens v. Brown, 7 Vet. App. 429, 433 (1995); Wensch v. Principi, 15 Vet. App. 362, 367 (2001).

After having carefully evaluated all of the evidence, the Board places greater weight of probative value on the 2001 IME's and 2010 VA examiner's opinions than it does on Dr. C.B.'s and the Veteran's own opinions to the contrary. The Board disagrees with the contention of the Veteran's representative that the mere fact that the Veteran is a physician places the opinions in equipoise. As noted above, the Board may choose one medical opinion over another if it provides reasons for doing so. See, e.g., Wensch, supra.

The Board places little, if any, weight of probative value on the medical opinion of Dr. C.B. in large part because his conclusions are based wholly on the incorrect premise that the Veteran's hypotensive episodes occurring in 1993 were caused by taking Felodipine. Indeed, the medical record clearly demonstrates that the Veteran did not start taking Felodipine until November 1994, more than a year after the Veteran experienced his first transient ischemic attacks, and after MRIs of the Veteran's brain showed a possible infarct. See the Veteran's January 11, 1993 Doctor's Orders [diagnosing transient ischemic attacks, and current medications of procardia, ranitidine, Tylenol, milk of magnesia, Benadryl and Mylanta]; see also the Veteran's November 29, 1994 VA Problem List [noting start of Felodipine treatment, 5 mg per day]. 

It is Dr. C.B.'s theory that "these hypotensive episodes in 1993, due to Felodipine, likely caused him to suffer significant brain ischemia resulting in additional neurologic loss which has contributed significantly to his current CNS abnormalities." Critically, Felodipine could not have caused the Veteran's 1993 ischemic attacks because the Veteran was not taking the medication at that time. Based on this crucial inaccuracy, Dr. C.B.'s overall opinion linking current "CNS abnormalities" to the use of Felodipine in 1993 is afforded no probative value. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008) [the probative value of a medical opinion comes from when it is the factually accurate, fully articulated, and sound reasoning for the conclusion, not the mere fact that the claims file was reviewed].

In addition, the Board adds that although Dr. C.B. used four degrees of separation to link the Veteran's current CNS abnormalities to the Veteran's use of Felodipine [that is, he asserted that Felodipine (1) caused hypotensive episodes in 1993, which (2) caused significant brain ischemia, that (3) resulted in neurological loss, which (4) has contributed significantly to the his current CNS abnormalities], Dr. C.B. did not identify what specific CNS abnormalities developed over this time period, nor did he address pertinent medical evidence of record linking the Veteran's neurological disabilities, such as peripheral neuropathy, to other causes. See, e.g., the Veteran's January 24, 2002 VA neurology report [noting that the Veteran's elevated sugar is the most probable cause of the peripheral neuropathy]. See Hernandez-Toyens v. West, 11 Vet. App. 379, 382 (1998) [the failure of the health care provider to provide a basis for his/her opinion goes to the weight or credibility of the evidence]; see also Bloom v. West, 12 Vet. App. 185, 187 (1999) [the probative value of a physician's statement is dependent, in part, upon the extent to which it reflects "clinical data or other rationale to support his opinion."]

Unlike Dr. C.B., both the November 2001 IME and the April 2010 VA examiner opined against a finding of causation between the Veteran's hypertension medication and his claimed disabilities, upon extensive and accurate review of the Veteran's records, the pertinent medical literature, and in the case of the VA examiner, evaluation of the Veteran. The IME and VA opinions appear to be more consistent with the medical record than is Dr. C.B.'s opinion, and the Veteran's opinion, discussed below. That is, the Veteran's currently claimed disabilities are fully explained by other causes, most if not all of which predated the prescription of his medications. The medical evidence of record further appears to indicate, consistent with the IME and VA examiner's conclusions, that symptoms associated with the medication use stopped when the medications were discontinued. The IME and VA examiner's conclusions also appear to be supported by the medical treatise documentation submitted by the Veteran, which indicate that side effects such as swelling of the legs and feet could be expected. The information supplied by the Veteran does not, however, appear to support the proposition that permanent sequelae such as he claims are to be expected.

That stated, with respect to the Veteran's own opinion, although in no way impugning the Veteran's motives, the Board believes that self interest may be a factor in his opinion. As noted above, the Veteran as a medical doctor is competent to render an opinion upon matters requiring medical expertise such as the etiology of a particular disability. Although the Court has held that the Board is not free to ignore the assertion of a claimant-physician as to any matter upon which he is competent to offer an opinion, "[t]his does not mean that the Board cannot consider the personal interest that the appellant-expert has in his own case . . . ." Pond v. West, 12 Vet. App. 341, 345 (1999) [citing Cartright v. Derwinski, 2 Vet. App. 24, 25 (1991) (noting that interest may affect the credibility, but not the competency, of testimony)].

The Veteran's self-interest in this case includes the receipt of monetary benefits if he is successful in pressing his claim. In contrast, the November 2001 Independent Medical Expert, whose opinion the Board finds highly probative for the reasons discussed above, is not affiliated with the VA. He was paid a single fee for his independent research into the matter, and his written opinion. His fee was not contingent on any particular conclusion made or on the final outcome of the case. Although Dr. C.B. is also an independent medical examiner who appears to confirm some of the Veteran's contentions, his medical conclusions are crucially based on an inaccurate factual review of the Veteran's medical history, as discussed in detail above. The Board adds that the VA examiner, while an employee of VA, also has no self-interest in this case. 

The Board recognizes that the medical treatise evidence submitted by the Veteran also listed rare side effects of the medications. This list includes literally dozens of side effects, including joint pain. Again, the IME and VA examiner indicated that joint pain experienced by the Veteran resolved when his medication was discontinued.

Thus, in the absence of a current disability resulting from VA medical care, no VA compensation may be paid. See 38 U.S.C.A. § 1151. For reasons explained above, the Board concludes that no permanent disability has been demonstrated as being due to VA medical care. The Board bases its conclusion on a review of the Veteran's entire medical record, to include the November 2011 IME and April 2010 VA examiner's opinions, and accords the medical opinions of Dr. C.B. and the Veteran relatively little weight.

In conclusion, the preponderance of the evidence reflects that although the Veteran had a frustrating course with the medications Nifedipine and Felodipine, which ended in the selection of a different medication for the control of his blood pressure, no current disability resulted therefrom. As explained above, the Veteran's and Dr. C.B.'s expert medical opinions to the contrary have been considered in this matter; however, the Board has chosen to place greater weight of probative value upon the opinions of the IME and VA examiner for the reasons set forth above.

In the absence of additional disability due to VA medical treatment, the matter of alleged VA negligence is moot. That is, in the absence of current disabilities which are demonstrated to be the result of VA medical care, whether such medical care was careless or not is of no consequence. Similarly, in the absence of disability due to VA medical treatment, the matter of (un)foreseeability need not be discussed. See 38 U.S.C.A. § 1151.

In short, for the reasons and bases expressed above, the Board concludes that a preponderance of the evidence is against the Veteran's claim for VA compensation under the provisions of 38 U.S.C.A. § 1151. His claim is accordingly denied.



ORDER

The October 8, 2010 Board decision to deny the issue of entitlement to compensation under 38 U.S.C. § 1151 for additional disability claimed to be due to VA medical treatment is vacated.

Entitlement to compensation under 38 U.S.C. § 1151 for additional disability claimed to be due to VA medical treatment is denied.



____________________________________________
DAVID L. WIGHT
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs